UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| SABRINA GRAY, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | No.: 2:20-CV-23-KAC-CRW |
| BALLAD HEALTH | ) |  |
| Defendant. | ) |  |

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case is before the Court on "Defendant Ballad Health's Motion for Summary Judgment" [Doc. 34]. Because there are no genuine disputes of material fact regarding Plaintiff's prima facie case for violation of the Tennessee Public Protection Act and Defendant is entitled to judgment as a matter of law, the Court **GRANTS** summary judgment to Defendant.

I. **Background**[1]

On February 24, 2014, Plaintiff Sabrina Gray began working as a registered nurse in the cardiovascular surgical department of Wellmont Health System [Doc. 1 at ¶ 4]. Plaintiff worked for Wellmont until it merged with Mountain States Health Alliance in February of 2018, producing Defendant Ballad Health [*See* Doc. 1 at ¶ 5].

To secure regulatory approval of the merger, Defendant agreed to a Certificate of Public Advantage (COPA) [*Id.*]. Under Section 68-11-1303 of the Tennessee Code, hospitals may form cooperative agreements and apply to the Tennessee Department of Health for a COPA. Tenn.

---

[1] Because Plaintiff is the non-moving Party, the Court describes the facts in the light most favorable to her. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

Code Ann. §§ 68-11-1303(b), (c). The Department of Health may approve the agreement after an administrative process which determines, in essence, whether the benefits of the agreement outweigh the costs of reducing competition. *See* Tenn. Code Ann. § 68-11-1303(e)(1). The Department of Health granted Defendant a COPA [*See* Doc. 35 at 2]. The COPA contains Terms of Certification (TOC) [Doc. 35 at 2].

The TOC contains a provision governing disparate pay rates throughout the now-merged health system [*Id.* at 3]. This provision, Section 3.08(b), states:

> (b) <u>Employee Pay/Benefits Equalization</u>. In order to achieve a uniform system of compensation, and competitiveness of pay for attracting and retaining employees, the New Health System shall . . . create and begin the implementation of a plan (the "Equalization Plan") to spend a minimum of $70,000,000 over the Ten-Year Period to eliminate differences in salary/pay rates and employee benefit structures among employees of the New Health System. Such spending commitment shall be incremental, i.e., shall constitute an addition to the Applicants' aggregate spending levels as of the Approval Date on employee pay and benefits. The Equalization Plan shall account for differences in salary/pay rates and employee benefit structures applicable to all levels of employees such that the New Health System offers competitive compensation and benefits for all the NHS Entities' employees. Such a plan shall begin to eliminate such differences as soon as practicable after the Issue Date.

[*Id.* at 18]. To satisfy this provision, Defendant set pay rate caps based on job classifications [Docs. 34-4 at 6; 35 at 3]. But Defendant did not reduce the salary of any employee whose preexisting pay rate exceeded the pay rate cap for his or her classification [Doc. 34-4 at 6-8]. And instead of providing raises to these employees who would otherwise be subject to the new pay rate cap, Defendant paid lump-sum yearly bonuses worth two (2) percent their annual salary [*Id.* at 8].

Plaintiff was one such employee. Plaintiff continued working as an Associate Clinical Leader for Defendant after the merger [Doc. 40-11 at 16]. Prior to the merger, Plaintiff's pay rate was $41.78 per hour [Doc. 34-4 at 7-8]. After the merger, that rate was higher than the pay rate cap for her job classification [*Id.*]. Therefore, in January of 2019, Plaintiff received a paycheck

2

Case 2:20-cv-00023-KAC-CRW   Document 59   Filed 12/21/22   Page 2 of 12   PageID #: 870

which did not include the annual pay raise she expected [*Id.*]. Instead of an increase in her hourly pay rate, Defendant gave Plaintiff a bonus worth two (2) percent of her annual compensation [*Id.*]. This upset Plaintiff because the annual bonuses, rather than raises, would not raise her hourly pay rate [Doc. 40-11 at 37].

Plaintiff spoke about this issue at a Public Hearing for the COPA Local Advisory Council on February 7, 2019 [Doc. 35 at 5]. This hearing provided a public opportunity for individuals to speak about Defendant [*Id.*]. At the hearing, Plaintiff stated:

> ***On January 23, 2019, I get my paycheck expecting to have a [two (2) percent] annual raise for my performance evaluation.*** These evaluations are done annually . . . and they're based on your work performance throughout the year. So I busted my back all year to make sure that I got that evaluation, and I got a great evaluation, by the way. ***Instead, I didn't get my bonus onto my hourly rate. I got it as a lump sum bonus.*** One time only for that year. . . . I don't want to have to leave this area because now I'm being told that of August of 2018 there was a pay grade decrease so that I cannot go any higher than I am. . . . They have always been tacked onto the hourly rate, always. . . . So my leader, when I went to her she did not know anything about a lump sum one-time bonus on my check and there were others to follow me with her that this affected. ***And it appears to be the older people in their [fifties (50s)] that it has affected because, of course, we're—we make the most because we're experienced and have been there the longest. . . . So just to make a long story short, I'm going to have to leave this area to make more money because they're—they handcuffed me. I cannot go any higher up at [] Ballad.*** And just an example, for an [eighty-three (83)] cent an hour raise for the next [ten (10)] years, which I plan on working until I retire, accumulates and had this been put on to my hourly rate it would've accumulated over the years, rather than a small lump sum bonus. ***I'm losing $101,587.20 in [ten (10)] years.*** . . . We have [traveling nurses] coming in this area that are making far more than I'm going to make. So I just can't understand the reasoning of having travelers brought back into the system when they don't want to pay me as—as a committed person less and going to bring travelers in here and pay them more. So I hope you're listening to my story. Thank you.

[Doc. 34-12 at 5-7 (emphasis added)]. Plaintiff's statement was one of forty-five (45) made by members of the public at the hearing [Doc. 35 at 6].

After Plaintiff made her statement, Rhonda Reeves, a human resources manager for Defendant, approached Plaintiff [Doc. 40-11 at 20]. Plaintiff and Reeves agreed to meet to discuss

3

Plaintiff's dissatisfaction [*Id.*]. At this meeting, Reeves told Plaintiff that Plaintiff should not be concerned about being terminated for speaking at the public forum [*Id.* at 30]. Plaintiff told Reeves that there was a staffing shortage at the cardiovascular department, which was affecting the nurses [*Id.* at 25]. Around the time of this meeting, Plaintiff also sent a letter to Hamlin Wilson, a Vice President of Employee Relations at Ballad Health, complaining about the staffing issues in her department [*Id.* at 25-27].

Because of the alleged staffing shortage, Plaintiff felt "overworked" [Doc. 1 at ¶ 10]. On March 13, 2019, Plaintiff called Logan Blakely, a coworker, three (3) times because Blakely was needed at work [*Id.*]. Plaintiff called Blakely from the desk of the hospital holding area, the area where patients are brought before their cardiovascular operations [Doc. 40-11 at 16]. Other employees were present for the call, but no patients were present [*Id.*]. Blakely did not answer, but Plaintiff failed to disconnect the call [Doc. 1 at ¶ 10]. Blakely's voicemail recorded Plaintiff yelling and swearing [Doc. 40-11 at 15]. Afterwards, Plaintiff approached Blakely, apologized, and self-reported her misconduct to her supervisor, Alicia Lawrence [Doc. 1 at ¶ 10]. Lawrence issued Plaintiff a written reprimand for "foul, screaming language," noting that Plaintiff had received warnings for similar incidents in the past[2] [Doc. 34-13].

On April 4, 2019, two of Plaintiff's coworkers complained to Reeves about Plaintiff's behavior [Doc. 34-5. at 2]. The coworkers reported that Plaintiff created an intimidating work

---

[2] On May 14, 2014, Plaintiff received a reprimand from her supervisor at Wellmont Health System, accusing her of using inappropriate language, disrupting the workplace by bringing personal problems into work, and making some coworkers fear for their safety [Doc. 34-11]. Then, in the summer of 2018, while Plaintiff was on vacation, a group of Plaintiff's coworkers complained about Plaintiff to Lawrence [Doc. 34-5 at 3-5].

4

environment and that she brought personal matters into work [Doc. 34-3 at 4-5]. These complaints caused Reeves to investigate Plaintiff's alleged misconduct [*Id.* at 2].

Reeves thereafter conducted a series of interviews with Plaintiff's department coworkers [*See id.* at 9-23]. Reeves summarized common themes or statements in an email to Wilson [Doc. 34-15 at 1-2]. In that same email, Reeves indicated that department coworkers felt that Plaintiff was the reason so many people were leaving the department [*Id.* at 2]. Further, Reeves noted that she had learned of two recordings of Plaintiff: the voicemail Plaintiff left with Blakely [Doc. 34-3 at 7-8], and a recording of Plaintiff conversing about intimate personal matters with her "off and on" boyfriend over the phone during work hours, [Doc. 40-11 at 17-19]. Reeves viewed these recordings as evidence corroborating the coworkers' complaints [Doc. 34-3 at 7-8].

Reeves recommended to Wilson and another executive that Plaintiff's employment be terminated [*Id.* at 2]. They concurred [*Id.*]. On April 15, 2019, Defendant terminated Plaintiff's employment [Doc. 34-3 at 4]. Plaintiff appealed her termination via letter, making eight (8) arguments against her termination, none of which addressed Plaintiff's statement at the public hearing, or any retaliation based on the same [*See* Doc. 34-14]. Defendant denied her appeal [Doc. 40-11 at 20].

Plaintiff sued Defendant, Logan Blakley, and Jane Doe on February 11, 2020 [Doc. 1]. Now only one claim against Defendant remains in this action [*See* Doc. 22, 47]. Plaintiff claims that Defendant violated the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 (TPPA) [Doc. 1 at ¶ 13]. Specifically, Plaintiff alleges that she "was discharged from her position solely for refusing to remain silent about illegal activities committed by the [D]efendant, Ballad, including, but not limited to, violations of the COPA Act and the COPA itself." [Doc 1 at ¶ 13].

Defendant deposed Plaintiff on March 19, 2021 [Doc. 40-11]. Defendant questioned Plaintiff about the reason for her termination:

> Q: Okay. Are you now telling this Court on March 19th, 2021, that [you are] alleging you were terminated for speaking to Ms. Reeves and putting in some letter to Mr. Wilson about the staffing shortage in the [cardiovascular operating room] and the environment, how it was affecting the staff? Is that what you are saying you were terminated for?
> A: Well, that's the only conclusion I can arrive at. When I met with Hamlin Wilson on March the 19th, I was issued the verbal warning on March the 20th, the very next day after Ms. Lawrence already had seven days['] notice of it.
> Q: Okay. ***My question is, again, are you telling this Court that the basis for your termination, in part, was speaking out about staffing shortages in the department?***
> A: ***I'm including that.***
> . . .
> Q: . . . Are you maintaining that the staffing shortages that you assert were present in the CVOR that you raised your concern to Ms. [Reeves] about was an illegal activity under state or federal law?
> A: It wasn't an illegal activity.
> . . .
> Q: Okay. But we can also agree that the other concern that you raised, the staffing issue that you've told us about today, was not an illegal activity. Correct?
> A: Correct.

[Doc. 40-11 at 26-27 (emphasis added)].

Defendant filed a motion for summary judgment [Doc. 34]. Plaintiff responded [Doc. 40]. And Defendant filed a reply [Doc. 43].

## II. Analysis

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at

907. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the opposing party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56).

"A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson*, 477 U.S. at 249). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247-48).

Tennessee is an at-will employment state. *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). But the Tennessee legislature codified a limited cause of action in the TPPA. *Id.* The TPPA provides that "[n]o employee shall be discharged or terminated **solely for** refusing to participate in, or for refusing to remain silent about, **illegal activities**." Tenn. Code Ann. § 50-1-304(b) (emphasis added).

To prevail under the TPPA, a plaintiff must establish (1) her status as an employee of the defendant employer; (2) her refusal to participate in or remain silent about "illegal activities"; (3) that she was terminated; and (4) an "exclusive causal relationship between [that termination and] her refusal to participate in or remain silent about illegal activities." *Franklin*, 210 S.W.3d at 528.

"[I]llegal activities" are "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). In addition to identifying "activities" in violation of the

7

criminal or civil code or any applicable regulation, Plaintiff must "demonstrate that the illegal activity implicated important public policy concerns." *Konvalinka v. Fuller*, No. E2017-00493-COA-R3-CV, 2019 WL 2323831, at *5 (Tenn. Ct. App. May 31, 2019) (citing *Franklin*, 210 S.W.3d at 533). "[A]n employee cannot meet [his] burden simply by claiming that he believed his employer's actions were 'wrong' or against 'public policy.'" *Sanders v. Henry Cnty.*, No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *8 (Tenn. Ct. App. Apr. 21, 2009). "To prevail on a whistleblower claim . . . an employee must establish that . . . the 'reporting of the illegal activity furthered a clear public policy,'" *Haynes v. Fomac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (citing *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 788 (Tenn. 2010)), not "merely advance[d] the employee's private interest," *Young v. United Parcel Serv., Inc.*, 992 F. Supp. 2d 817, 839 (M.D. Tenn. 2014). In alleging a TPPA claim, a plaintiff must "identify the unambiguous constitutional, statutory, or regulatory provision," *see Konvalinka*, 2019 WL 2323831, at *6, that Plaintiff allegedly refused "to remain silent about," *see* Tenn. Code Ann. § 50-1-304.

In addition, to establish a prima facie case under the TPPA, a plaintiff must "show an ***exclusive*** causal relationship between their protected activity and the adverse employment action." *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855. 872 (E.D. Tenn. 2013) (emphasis added). Plaintiff's alleged protected activity must be the "sole reason" for her termination. S*ee Hugo v. Millenium Lab'ys, Inc.*, 590 F. App'x 541, 544 (6th Cir. 2014) (citing *Guy v. Mut. Of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002) (emphasis omitted)). Indeed, under the TPPA "a defendant can rebut a plaintiff's claim simply by 'articulat[ing] a non-retaliatory reason for [the plaintiff's] discharge.'" *Sourinho v. Rich Prods. Co.*, No. 21-5289, 2021 WL 4735844, at *3 (6th Cir. Oct. 12, 2021) (citing *Williams v. City of Burns*, 465 S.W.3d 96, 115 (Tenn. 2015)). "All that is necessary is for the defendant to 'introduce admissible evidence showing that . . . there was at

8

least one non-retaliatory'" reason for the discharge. *Sourinho*, 2021 WL 4735844, at *3 (citing *Williams*, 465 S.W.3d at 115). A "plaintiff has indeed a formidable burden in establishing elements number two and four of the [TPPA] cause of action." *Darnall v. A+ Homecare, Inc.,* No. 01-A-01-9807-CV-00347, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999).

Here, even viewing all of the facts in the light most favorable to Plaintiff, she has not established a prima facie case for violation of the TPPA. First, Plaintiff has not established that she refused to remain silent about "illegal activities" under the TPPA—element two. And even if she had, there is no genuine dispute of material fact regarding whether Plaintiff was terminated "solely" for her alleged refusal to remain silent about any "illegal activities"—element four.

The sole alleged "illegal activities" that Plaintiff specifically identified in her Complaint were Defendant's "violations of the COPA Act and the COPA itself" [Doc. 1 at ¶ 13]. A "general allusion" to a provision of law or regulation that the Defendant allegedly violated is not sufficient to support a TPPA claim. *Konvalinka*, 2019 WL 2323831, at *6. Instead, Plaintiff must "identify the unambiguous constitutional, statutory, or regulatory provision that was implicated." *Id.*; *see also Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555 (Tenn. 1988) (holding that plaintiff's complaints that defendant failed to comply with the Internal Revenue Code were insufficient to support a TPPA claim). Plaintiff's Complaint does not identify any portion of the "COPA Act" that she believed Defendant allegedly violated [*See* Doc. 1]. And she only generally references how the Defendant's actions purportedly violated the "COPA itself" [*See* Doc. 1 ¶¶ 6, 9 (describing how Defendant's alleged actions allegedly violated "the COPA")]. But in Plaintiff's Response to Defendant's Motion for Summary Judgment, she identifies, for the first time, Defendant's violation of Section 3.08(b) of the TOC of the COPA as the "illegal activities" that underlie her TPPA claim. [Doc. 41 at 23]. But violations of the TOC of the COPA are not "illegal activities"

9

under the TPPA.

To be "illegal activities," the alleged activities of which Plaintiff complained and the reporting of such activities must "implicate[] fundamental public policy concerns." *Franklin*, 210 S.W.3d at 533 (internal quotation marks omitted). The court's "'inquiry focuses on whether some important public policy interest embodied in the law has been furthered' by the employee's actions." *Id.* at 532 (citing *Guy*, 79 S.W.3d at 538); *see also Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) ("[Plaintiff] must not only show that she believed that copying the report was illegal but that her refusal to do so serves a public purpose that should be protected." (internal quotation marks omitted)). "[I]t is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest." *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 797 (M.D. Tenn. 2010) (citing *Bright v. MMS Knoxville, Inc.*, No. M2005-02668-COA-R3-CV, 2007 WL 2262018, at *4 (Tenn. Ct. App. Aug. 7, 2007)); *see also Young*, 992 F. Supp. 2d at 839.

Even assuming that Plaintiff was reporting Defendant's violation of the COPA[3] during the February 7, 2019 Public Hearing, there is no evidence that Plaintiff's reporting of Defendant's failure to give her a raise in her hourly rate, as opposed to a lump-sum yearly bonus, furthered a public policy embodied in the law. Instead the record shows that Plaintiff advocated for her own private interest at the hearing. After explaining that Defendant did not give her a raise in her hourly rate, Plaintiff explained that she felt that she was "going to have to leave this area to make more money because . . . I cannot go any higher up" working for Defendant [Doc. 34-12 at 7]. She

---

[3] It is unclear whether the COPA, a private agreement approved by the Tennessee Department of Health, falls within "the criminal or civil code of this state or the United States or any regulation," such that its violation could qualify as "illegal activit[y]." *See* Tenn. Code Ann. § 50-1-304(b). But the Court need not decide that issue here.

10

Case 2:20-cv-00023-KAC-CRW   Document 59   Filed 12/21/22   Page 10 of 12   PageID #: 878

anticipated "losing $101,587.20 in [ten (10)] years" [*Id.*]. Plaintiff did identify others who Defendant's actions may affect, but Plaintiff did not advocate on behalf of anyone other than herself. [*See id.* at 6]. And even if others might have benefited from Plaintiff's statement, incidental benefits to others do not transform a private interest into a public one. *See Bright,* 2007 WL 2262018, at *5 (concluding that a plaintiff's personal interest in avoiding an undesirable situation "does not fall within the scope" of the TPPA).

Plaintiff appears to identify "the welfare of employees" at Defendant as the fundamental public policy that her statements at the Public Hearing advanced [Doc. 41 at 27 (emphasis omitted)]. But nowhere does Plaintiff explain how reporting Defendant's failure to give her a raise in her hourly rate would further "the welfare of employees" at Defendant, other than herself [*See id.*]. Under the law, Plaintiff must demonstrate **both** a public policy at issue **and** how reporting the alleged "illegal activities" furthered that public policy. *See Franklin*, 210 S.W.3d at 532 (holding that identifying a violation of applicable law alone is insufficient to show that plaintiff furthered a public policy); *Boyd v. Edwards & Assocs., Inc.*, 309 S.W.3d 470, 474 (Tenn. Ct. App. 2009) ("Since the plaintiff in this case failed to show that defendants' activities have 'implicated fundamental public policy concerns', the Trial Court properly dismissed plaintiff's TPPA claim."). That critical connection is missing here. Accordingly, Plaintiff has not established that she refused to remain silent about "illegal activities" under the TPPA.

But even if Plaintiff had established that she refused to remain silent about "illegal activities" under the TPPA, there is no genuine dispute of material fact regarding whether Plaintiff was terminated "solely" for her alleged refusal to remain silent about those "illegal activities." In her deposition, Plaintiff admitted that "the basis for . . . [her] termination, in part, was speaking out about staffing shortages in the department" [Doc. 40-11 at 26]. The TPPA, unlike a common

11

law action for retaliatory discharge, requires that Plaintiff's refusal to remain silent about any "illegal activities" be the exclusive or sole cause of her termination. *See Levan*, 984 F. Supp. 2d at 872. Because Plaintiff admitted that she was not discharged "solely" for refusing to remain silent about "illegal activities," she cannot establish a TPPA claim. *See* Tenn. Code Ann. 50-1-304(b); *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011); *Levan*, 984 F. Supp. 2d at 872.

### III. Conclusion

Because Plaintiff cannot establish elements two or four of a prima facia case for violation of the TPPA, the Court **GRANTS** "Defendant Ballad Health's Motion for Summary Judgment" [Doc. 34]. An appropriate judgment shall enter.

IT IS SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge